# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**LUCIA RAMOS,**

        **Plaintiff,**

**-vs-**                                   **Case No.  6:06-cv-450-Orl-28UAM**

**COMMISSIONER OF SOCIAL
SECURITY,**

        **Defendant.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

      Plaintiff Lucia Ramos ["Ramos"] appeals to the district court from a final decision of the Commissioner of Social Security [the "Commissioner"] denying Ramos's application for Disability Insurance Benefits and Supplemental Security Income benefits. *See* Docket No. 1 (complaint).  For the reasons set forth below, the Commissioner's decision should be **reversed and remanded**.

## I.    PROCEDURAL HISTORY

      On December 9, 2002, Ramos filed a claim for disability insurance benefits and supplemental security income benefits, claiming disability as of November 21, 2002.  R. 58-60, 398-401.  On June 28, 2005, the Honorable Robert Burdette, Administrative Law Judge ["ALJ"], held a 43-minute hearing on Ramos's claim in Tampa, Florida.  R. 412 - 438.  Attorney David Siar represented Ramos at the hearing.  R. 412.  The ALJ heard testimony from Ramos and Gerald Wiley, vocational expert ("VE").

On August 23, 2005, the ALJ issued a decision that Ramos was not disabled and not entitled to benefits. R. 16A-33. Following a review of the medical and other record evidence, the ALJ found that Ramos could not perform her past relevant work as a nursing assistant or cashier/checker. R. 30, Finding 7. The ALJ found that Ramos nevertheless retained the residual functional capacity ["RFC"] to perform a significant range of the physical exertional requirements of light work. R. 30, Finding 11. Applying the Medical-Vocational Guidelines, the ALJ concluded that Ramos was not disabled. R. 31, Finding 12.

The Appeals Council denied review. R. 4-6. On April 7, 2006, Ramos timely appealed the Appeals Council's decision to the United States District Court. Docket No. 1. On October 25, 2006, Ramos filed in this Court a memorandum of law in support of her appeal. Docket No. 13. On December 26, 2006, the Commissioner filed a memorandum in support of his decision that Ramos was not disabled. Docket No. 14. The appeal is ripe for determination.

## II.    THE PARTIES' POSITIONS

Ramos assigns five errors to the Commissioner. First, Ramos claims that the Commissioner erred in analyzing her RFC. Second, Ramos claims that the Commissioner erred because Ramos met the Listing 12.04. Third, Ramos claims that the Commissioner failed to meet its burden at step 5 of the sequential analysis. Fourth, Ramos claims there is a discrepancy between the ALJ's findings regarding the VE's testimony and the hearing record, and that the hypothetical presented to the VE was incomplete. Fifth, Ramos argues that the ALJ failed to properly apply the pain standard.

The Commissioner argues that substantial evidence supports the Commissioner's decision that Ramos retained the RFC to perform jobs existing in significant numbers in the national economy and, therefore, Ramos is not disabled.

## III.   THE STANDARD OF REVIEW

### A.   AFFIRMANCE

The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord*, *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.  *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  *Foote*, 67 F.3d at 1560; *accord*, *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

### B.   REVERSAL

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause.  42 U.S.C. § 405(g)(Sentence Four).  The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision

fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Dep't of Health & Human Serv.*, 21 F.3d 1064, 1066 (11th Cir. 1994); *accord, Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). This Court may reverse the decision of the Commissioner and order an award of disability benefits where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord, Bowen v. Heckler*, 748 F.2d 629, 631, 636 - 37 (11th Cir. 1984). A claimant may be entitled to an immediate award of benefits where the claimant has suffered an injustice, *Walden v. Schweiker*, 672 F.2d 835, 840 (11th Cir. 1982), or where the ALJ has erred and the record lacks substantial evidence supporting the conclusion of no disability, *Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985).

## C.   REMAND

The district court may remand a case to the Commissioner for a rehearing under sentence four of 42 U.S.C. § 405(g); under sentence six of 42 U.S.C. § 405(g); or under both sentences. *Jackson v. Chater*, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996). To remand under sentence four, the district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. *Jackson*, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); *accord, Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

-4-

Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision. *Falcon v. Heckler*, 732 F.2d 872, 829 - 30  (11th Cir. 1984) (remand was appropriate to allow ALJ to explain his basis for determining that claimant's depression did not significantly affect her ability to work) (treating psychologist acknowledged that claimant had improved in response to treatment and could work in a supportive, non-competitive, tailor-made work environment).   On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence.  *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (ALJ should consider on remand the need for orthopedic evaluation).   After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction.  *Jackson*, 99 F.3d at 1089, 1095.[1]

## V.     THE FACTS

Ramos, born May 29, 1961, was forty-four years old at the time of the ALJ's decision.  T. 33, 58.  She has a high school education, and attended some college.  R. 72, 82.  Within the past 15 years prior to the ALJ's decision, Ramos worked for more than six months each as a military supply specialist, and as a nursing assistant.  R. 67.  She also worked a few months duration at numerous other jobs such as a crossing guard, census numerator, group home care-giver, recreational department

---

[1]The time for filing an application for attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under sentence four and sentence six.  *Jackson*, 99 F.3d at 1089, 1095 n.4 and surrounding text.  In a sentence-four remand, the EAJA application must be filed after the entry of judgment before the district court loses jurisdiction.  *Id.*  In a sentence-six remand, the time runs from the post-remand entry-of-judgment date in the district court.  *Id.*  Any Plaintiff intending to seek attorney's fees for past-due benefits under 42 U.S.C. § 406 (b)(1)(A) shall move the Court to include in any remand order an extension of the 14-day period described in Fed. R. Civ. P. 54 (d)(2)(B) so as to specify an extended deadline that follows the Commissioner's determination of Plaintiff's past-due benefits.  *Bergen v. Comm'r of Soc. Sec.*, 454 F. 3d 1273, 1278 n.2 (11th Cir. 2006).

specialist, farm store associate, and file clerk.  R. 67, 73.  Ramos claims disability as of November 21,

2002, due to residual back pain from a work-related injury suffered on January 10, 2000.  R. 66, 140.

On the day following her injury, Ramos was examined by physician's assistant, William F.

Rousseau.  R. 140-41.  Upon examination, Ramos was 63 inches tall, weighed 117 pounds, and her

blood pressure was 102/70.  She reported no prior significant medical history, except for acute

sinusitis.  Orudis, ketoprofen cream, Flexeril and use of a donut cushion were prescribed for

lurnbosacral contusion and sprain.  She was allowed to return to work with no lifting more than 10

pounds, and no climbing or squatting.  R. 140-41.

Ramos followed up with Rousseau on January 18, 2000, and complained  that her 45- minute

drive to work aggravated her back pain.  R. 137.  Sitting also aggravated her pain, but her job required

her to sit most of the time.  *Id.*  Rousseau discontinued Orudis and added naprosyn, and prescribed

physical therapy three times a week for the next two week.  R. 137-38.  Rousseau did not change her

work-related restrictions.  R. 137.  On February 1, 2000, Ramos saw Rousseau and reported that she

was still performing a lot of bending, squatting, pushing, and pulling, despite her work-related

restrictions.  R. 134.  Ramos ambulated with a slight limp on the left, but had no difficulty getting on

and off the exam table.  *Id.*  Physical therapy and Decadron were prescribed.  R. 135.

Lutz H. Schlicke, M.D, an orthopedic surgeon, examined Ramos on July 17, 2000, and

reviewed her lumbar MRI from May 5, 2000.  R. 145-47.  Dr. Schlicke stated the scan showed some

stenosis secondary to facet hypertrophy, particularly at L4-5.  R. 147.  His diagnosis was mostly likely

flare up of her spinal stenosis related to her work injury.

Ramos also was treated at First Care beginning on April 28, 2000.  R. 148-55.  Ramos

complained of low back and left leg pain.  R. 155.  Testing was ordered, and she was restricted to

sitting, standing, walking, and/or driving for 5 -8 hours. R. 154. With breaks, she could occasionally

lift up to 10 pounds. She was told to avoid excessive walking, and bending, or prolonged standing.

R. 154. She was taking Soma, Celebrex, Darvon, and Ultram. R. 150-55. She continued with these

complaints on May 12 and June 16, 2000. On June 16, 2000, her lifting restrictions were increased

to 20 pounds frequently. R. 150. An abdominal ultrasound on June 18, 2000, was normal. R. 194.


On August 31, 2000, Lee Kadosa, M.D., who is Board Certified in Occupational Medicine,

conducted an orthopaedic evaluation of Ramos. R. 156-60. After Ramos fell at work on January 10,

2000, she was off work the rest of that day and the next, but then she returned to work. R. 156. She

worked a week when the hospital told her she was no longer needed due to budget cuts. *Id*. The

staffing agency who sent her to the hospital to work, hired her to work in their office performing light

duty work. *Id*. She worked there for one week and then complained that the drive to the office

increased her pain. *Id*. After a month of physical therapy, Ramos began to feel better and she returned

to work as a census enumerator for three months. R. 158. Following that, she began working as a

crossing guard for the police department on August 14, 2000, and she continued to perform that job

for 3.5 hours per day, 5 days per week. *Id*. She continued to receive physical therapy twice a week.

*Id*. Ramos rated her low back pain as 8.5 on a 0-10 scale, with radiation into the left leg and foot. *Id*.

She denied numbness, but complained of left knee weakness with buckling but no falling, and

swelling in her knees and feet. *Id*. Dr. Kadosa found that Ramos weighed 118 pounds and her blood

pressure was 130/90. R. 157. Straight leg raising tests were positive on the left at 35 degrees, but

negative on the right. R. 159. Motor strength, muscle mass and tone, reflexes, and sensation were

normal in the upper and lower extremities. *Id*. Lumbar spine range of motion was reduced 25-30%.

*Id.*  Dr. Kadosa's impression was that Ramos suffered from: (1) chronic low back pain due to sprain/strain; (2) chronic sprain of the sacroiliac joint capsular ligaments, more on the left than the right; (3) left piriformis syndrome with possible sciatic nerve entrapment syndrome; and (4) rule out spondylolisthesis and spondylolysis L5-S1.  *Id.*   Dr. Kadosa prescribed x-rays, MRI scan, physical therapy, constant back brace, nonsteroidal anti-inflammatory drugs (NSAIDS), a muscle relaxant, and an analgesic.  R. 160.  Dr. Kadosa restricted Ramos from repeated bending, stooping, and crouching; sustained sitting, standing, and walking; sustained position of the neck; heavy lifting, carrying, pushing, or pulling; avoid contact sports or running; and she was allowed to continue working as a crossing guard.  R. 160.

Dr. Kadosa performed x-rays on September 29, 2000. R. 214.  Pelvic and lumbar spine x-rays were normal.  Id.  The SI joints appeared moderately osteoarthritic, more on the right than the left.  *Id.*  Ramos received a thoracic spine block on that date and received prompt pain relief at the procedure site.  R. 213.

John C. Baker, M.D., an orthopaedic surgeon, examined Ramos on October 16, 2000, in connection with her Worker's Compensation claim.  R. 161-163.  Ramos claimed that she could only walk one to two blocks, and pain kept her from sleeping occasionally.  R. 161.  At the time, she was performing light duty as a crossing guard and as a store associate.  R. 161-62.  Dr. Baker noted that Ramos got on and off the exam table and up and down from a chair without difficulty.  R. 162.  Her gait was normal, as was her motor, sensory, and reflex exam of the lower extremities.  *Id.*  There were some lumbar muscle spasms, but she had 80% retained motion in the lumbar spine.  *Id.*  Lumbosacral x-rays were normal.  *Id.*  The MRI showed a narrow spinal canal, but no disk disease.  *Id.*  Dr. Baker's diagnoses were sacral contusion and lumbar strain.  *Id.*  Dr. Baker opined that Ramos could continue

working at the light level with no lifting over 15 pounds and frequent position change.  R. 163.  Dr. Baker found that Ramos had not reached maximum medical improvement and recommended referral to a pain management center but no surgery.  *Id.*

Ramos received physical therapy from February 1, 2000 through October 18, 2000 at Kessler Rehabilitation Services, when she stopped to attend therapy at another facility closer to her home.  R. 164-79.  The therapist noted that Ramos had slightly improved with the treatment.  R. 164.

On November 8, 2000, Norman D. Guthrie, M.D., performed an independent psychiatric evaluation of Ramos.  R. 180-90.  Ramos complained of depression and worry regarding her medical condition, financial distress, and her future.  R. 185.  Her activities with her daughters had been severely curtailed.  She complained of insomnia, crying spells, obsessive rumination, hopelessness, thoughts of suicide without intent, and frustration.  R. 185-86.  On days she did not go to work, she spent most of the time lying in bed or on the floor for pain relief.  R. 186.  She denied having a history of prior psychiatric treatment.  *Id.*  Dr. Guthrie did not test Ramos's memory function, but opined she was intellectually functioning in the average to above average level and her memory was normal.  R. 188. Dr. Guthrie administered the Beck Depression Inventory and completed a Hamilton Rating Scale for Depression.  *Id.*  Dr. Guthrie diagnosed major depression, single episode, and a GAF of 60.[2]  R. 189.  He opined that, from a purely psychiatric standpoint, there were no significant restrictions in her

---

[2] The Global Assessment of Functioning (GAF) Scale rates the patient's psychological, social and occupational functioning on a hypothetical continuum of mental health and illness, without including impairment in functioning due to physical or environmental limitations.  DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (American Psychiatric Association 4th Ed. 1994) [hereinafter "DSM-IV"] at 32.  A GAF code of 51 - 60 indicates moderate symptoms, or moderate difficulty in social or occupational functioning (*e.g.*, few friends, conflicts with peers or co-workers).  DSM-IV at 32.

ability to function in a competitive workplace situation. R. 190. However, her current level of anger and irritability would probably affect her performance at work, although it was possible that these issues would improve with treatment. *Id.* Dr. Guthrie he recommended referral to a psychiatrist for consideration of medication and psychotherapy. *Id.*

Ramos's physical therapist, Jerry Jamora, stated on November 24, 2000, that Ramos had received 18 treatments since October 12, 2000, but she complained of increased pain secondary to increased workload. R. 210. Ramos rated her pain as 8/10, but added that her average daily pain was 5-6/10. *Id.* Ramos complained that standing, walking and bending aggravated her the most. *Id.* She cooked, washed dishes, and did the laundry, but these activities also aggravated her pain. *Id.* She did not vacuum or perform other household chores due to discomfort. *Id.* Driving also was uncomfortable. *Id.* Her physical therapy goals had not been met. R. 210-11. She would continue with physical therapy, three times per week, for four weeks. R. 211. On December 5, 2000, Ramos received bilateral SI blocks and trigger point blocks. R. 209.

Lumbar spine x-rays on December 20, 2000, showed satisfactory alignment, well-maintained disk spaces, no displacement, and concavities at L3, L4, and L5 suggestive of Schmorl's nodes. R. 193.

Ramos saw Cesar L. Ruiz, M.D. for another psychiatric evaluation on December 22, 2000. R. 198-203. Dr. Ruiz diagnosed major depression, single episode. He assessed that her GAF should be lower than 60 due to depression with interference in her daily life, including relationships with her family and her boyfriend, and coping with changes in her life; however, Dr. Kadosa did not give a GAF assessment. R. 203. He opined that Ramos should start therapy with Dr. Guthrie, as she stated she had a good rapport with him. *Id.*

Ramos's physical therapist, Maria Garcia, stated on December 29, 2000, that Ramos had received six treatments since November 24, 2000, and she currently rated her pain as 4-5/10 with flares to 7.5/10.  R. 207.  She did not complain of radicular pain as previously described, and she continued to maintain her light daily activities.  *Id*.  Straight leg raising was 70 degrees on the right and 48 degrees on the left.  *Id.*  Motor strength was 5/5, except it was reduced to 4/5 in the right hip flexor.  *Id*.  She had met the goal of independence in her home exercise program.  *Id*.

George L. Warren, M.D., performed an independent psychiatric evaluation of Ramos on January 9, 2001.  R. 131-33.  Ramos drove two hours for the appointment, which aggravated her back pain.  R. 131.  She was taking Motrin, Soma, and Celebrex, which provided only minimal pain relief.  *Id*.  She rated her average daily pain as 7.5/10.  *Id*.  She had seen two psychiatrists since her injury, and both had recommended medication and therapy for depression.  *Id*.  Ramos reported that she had tried to work at various jobs since her injury, such as a census taker, school crossing guard, and farm store clerk, but she had been unable to continue these jobs due to pain.  *Id*.  She had three daughters, but felt she had been unable to pay attention to things happening in their lives due to her pain.  R. 131-32.  She complained of five-pound weight loss,  low energy level, poor memory, insomnia, and suicidal ideations.  R. 132.  Dr. Warren diagnosed major depression, single episode, psychological factors aggravating response to pain, and global assessment of functioning (GAF) of 45.[3]  *Id*.  Dr. Warren prescribed Zoloft, Desyrel, and psychotherapy.  *Id*.  He opined that Ramos was unable to work at any job which required more than minimal attention and concentration.  R. 133. Dr. Warren further opined that it may take Ramos up to six months to reach maximum medical improvement.  *Id*.

---

[3] A GAF code of 41 - 50 indicates serious symptoms, or serious impairment in social or occupational functioning (*e.g.*, no friends, unable to keep a job).  DSM-IV at 32.

Dr. Kadosa administered an epidural spinal injection [ESI] on February 15, 2001, which resulted in severe headache.  R. 218.  Ramos was hospitalized from February 20 to 23, 2000, due to continued headache.  R. 217.  A CT scan of her brain was normal.  R. 221-22.  Ramos improved with medications and blood patch for post-spinal tap headache and low back pain.  R. 217.

Gregory T. Flynn, M.D., examined Ramos on March 12, 2001, and reviewed her records. R. 234-238.  Ramos reported she was taking Darvocet, Soma, Celebrex, and Claritin.  R. 236.  She was unemployed, and continued with medical and psychiatric treatment.  *Id*.  Rest, physical therapy, and medication helped her pain, but sitting, standing, walking, reaching, stretching, flexing, extending, and straining worsened her pain.  *Id*.  Dr. Flynn found Ramos's blood pressure was 141/89.  *Id*. Ramos rated her pain as 7/10 in her legs and 8/10 in her back.  *Id*.  Her gait was normal, her posture was erect, and her motor strength was normal.  R. 237.  A straight leg raising test was positive on the left at 70 degrees and on the right at 80 degrees.  *Id*.  Dr. Flynn diagnosed depression, facet joint hypertrophy, bulging disk, congenital spinal canal stenosis, lumbar radiculopathy, lumbago, coccydynia, and piriformis syndrome.  R. 237-38.  Dr. Flym recommended continued psychiatric treatment and a functional capacities evaluation.  R. 238.

Mauricio Rubio, M.D., reviewed Ramos's records and psychiatrically evaluated her on April 4, 2001.  R. 271-74.  Ramos complained of low back and left leg pain and severe headaches as a side effect of her epidural injections.  R. 271.  She complained of depression with anger, hopelessness, helplessness, weight loss, and suicidal ideations but no attempts.  *Id*.  She was taking only Celebrex and muscle relaxants.  R. 272.  Dr. Rubio found Ramos's mood was depressed and her motor behavior was somewhat reduced, but she was cooperative and her affect was appropriate.  R. 273.  Her short-

term memory was fair.  *Id*.  Diagnosis was major depression, single episode, with a GAF of 40.  R. 274.  Outpatient psychiatric visits and medications were prescribed.  *Id.*

On April 27, 2001, Dr. Rubio prescribed Effexor and Remeron, and encouraged Ramos to attend church and any other social activities.  R. 270.   After Ramos began taking medication, Dr. Rubio noted improvement in her depression.  *Id*.  Ramos's depression continued to improve and, in June 2001, she reported that she had financial problems and was looking for work.  *Id*.  In July 2001, Ramos's depression increased somewhat when her boyfriend left her, but she continued to look for work.  *Id*.  Effexor was changed to Celexa due to a rash.  *Id*.  On August 3, 2001, Ramos reported that she was working and managing well.  R. 269.  Ramos reported that she was satisfied with her employment in September 2001, but in September and October 2001, she had increased depressive symptoms due to urinary tract infection (UTI) and running out of Celexa.  *Id.*  On October 15, 2001, Ramos complained of weight loss and poor sleep, and Dr. Rubio gave her a note recommending that she change to day shift work.  R. 268.

On September 19, 2001, Dr. Flynn recommended a differential diagnostic epidural.  R. 233.  On that date, Ramos complained of pain at the level of 8/10 and her blood pressure was 111/72.  *Id*.  Dr. Flynn found that she had left leg muscle spasm with positive left straight leg raising test at 90 degrees.  *Id*.  Strength, sensation, and reflexes were all normal.  *Id*.  Dr. Flynn advised Ramos to continue her light duty work status and to use her RS medical stimulator.  *Id*.

Dr. Rubio's records from November 2001 through January 2002 showed that Ramos continued working the night shift and her depression and anxiety increased with the foreclosure of her home.  R. 268.  Ramos stated that she was not taking the prescribed Clonazepram because she could not

afford it. *Id*. Ramos moved into an apartment with her daughter. *Id*. Dr. Rubio stated in January

2002, Ramos appeared to be adjusting and looked less anxious and depressed. *Id*.

On January 17, 2002, Ramos received the differential diagnostic epidural injection. R. 229-32.

Following the injection, she was able to ambulate with ease and had normal neurological functions.

R. 231. The plan was to repeat with two more ESIs. *Id*. Dr. Flynn released Ramos to return to work.

*Id*. Dr. Flynn saw Ramos again on January 23, 2002, when he noted her gait was abnormal, but much

improved. R. 227. She was not walking as stiffly, but she continued with decreased range of motion

of the lower spine with paravertebral muscle spasms. *Id*. Dr. Flynn recommended proceeding with

discography, which was performed on February 14, 2002. R. 225-27. On February 20, 2002, Dr.

Flynn stated that Ramos continued with complaints of low back and left leg pain (6/10), and no change

in her depression. R. 224. The discography results at L3, L4, and L5 were completely normal. *Id*.

The only pathology for her pain was bulging disk at L4-5, for which a permanent impairment rating

of 6% was assessed. *Id*. Dr. Flynn determined that Ramos had reached maximum medical

improvement as of that date and released her to return to work with no restrictions. *Id*.

Dr. Rubio added Wellbutrin on February 13, 2002, when Ramos noted she was living alone

and associating only with people at work during working hours. R. 267. She continued to lose

weight. *Id*. Ramos's depression had improved on March 13, 2002, when she reported that she

planned to move to California. *Id*. She had not lost more weight and weighed 116.5 pounds. *Id*. She

was taking Remeron and Wellbutrin, and Wellbutrin was increased. *Id*. Ramos was more depressed

on May 31, 2002, because her children planned to move, her dating situation had failed and she had

sinusitis. *Id*. On August 23, 2002, Ramos continued working from 11:00 PM to 7:00 AM, and she

was communicating more with her coworkers. R. 266. She was adjusting to living alone and was

improved in her depression and anxiety. *Id*. Dr. Rubio stated on that date that Ramos had reached maximum medical improvement. *Id*. On October 9, 2002, Dr. Rubio rated her as 5% permanent impairment as to her whole body. R. 378.

On July 11, 2002, Ramos went to the Florida Hospital emergency room with complaints of back pain. R. 239-46. A physical examination showed that all systems were within normal limits. R. 240, 243. No medications were prescribed and no limitations in activity were recommended. R. 241.

On September 25, 2002, Ramos went to the Highlands Regional Medical Center emergency room due to complaints of low back pain after lifting a patient while working at the hospital. R. 247-55. A physical examination showed that all systems were normal, except that she experienced pain lifting her leg at 20 degrees. R. 253. Ramos was given a prescription for Parafon Forte and was referred to Dr. Sharma for follow-up. R. 248.

Ramos went to the Florida Hospital emergency room again for back pain on October 3, 2002, where she received a refill of her Parafon Forte prescription. R. 256-62. On November 7, 2002, Ramos returned to the Highlands Medical Group Emergency Room. R. 263-64. On that date, it was noted that she continued working part-time. R. 263.

On October 18, 2002, Ramos reported to Dr. Rubio that her depression had increased following another work-related injury. R. 266. She also claimed increased back pain when trying to help a patient get up from a chair. *Id*. Remeron was discontinued and Neurontin was prescribed. *Id*. Ramos reported feeling better on December 13, 2002, with Neurontin, however, she had not returned to work due to back pain. *Id*. Since she was not earning a salary, she was having financial problems. *Id*.

A lumbar spine MRI was performed on December 16, 2002. R. 284. The test showed moderate spinal stenosis at L4-5 and minimal to moderate spinal stenosis at L3-4, both due to disk bulging with bony hypertrophy. *Id*.

Dr. Shydahud, a neurologist, referred Ramos for physical therapy on January 13, 2003, following her September 25, 2002 back injury. R. 298. Ramos completed nine visits on February 4, 2003. R. 300. The therapist noted that Ramos improved with treatment until January 30, 2003, when Ramos stated that driving to Orlando that day had significantly increased her pain. R. 300, 334. On February 3, 2003, Ramos stated that a neurologist in Tampa had told her to stop pain management and therapy. R. 300, 336.

Jorge J. Inga, M.D., examined Ramos on January 31, 2003, when she complained of pain in her low back, lower extremities, and shoulders. R. 301-05. Ramos reported that her symptoms began with a work-related injury on September 25, 2002, while working as a nursing assistant. R. 301. At the time of her examination, Ramos weighed 126 pounds and her blood pressure was 120/70. R. 302. Ramos had good muscle strength, reflexes, and sensation. R. 303. Her gait was normal. *Id*. There was tenderness and spasm of the lumbar spine with bilateral positive straight leg raising test at 70 degrees. R. 304. Dr. Inga reviewed the May 2000 MRI and diagnosis of bulging disk at L4-5. *Id*. Dr. Inga stated Ramos was not a surgical candidate and he opined she had reached maximum medical improvement with a 5% impairment rating of the whole body. R. 305. Dr. Inga opined that Ramos was capable of returning to work with no lifting more than 20 pounds and avoidance of repetitive pushing, pulling, bending, or lifting. *Id*.

Bruce G. Borkosky, Psy.D., consultatively evaluated Ramos on March 17, 2003. R. 306-08. Ramos reported that she lived with her 11, 17, and 20-year-old daughters in a house. R. 306. She

-16-

was taking Remeron, Neurontin, and Wellbutrin.  *Id*.  She had not worked since October 2002.  *Id*.

She drove herself to the appointment.  R. 307.  Dr. Borkosky opined that Ramos's intellectual level

was low average; judgment and insight were fair; memory was normal; and there were no psychotic

symptoms.  R. 307-08.  Dr. Borkosky's diagnoses were major depression, pain disorder, and features

of personality disorder, not otherwise specified (NOS).  R. 308.  He opined that Ramos had good

ability to understand, remember, and carry out instructions, and fair ability to respond appropriately

to supervision, coworkers, and work pressures.  *Id*.

Paul J. Zak, M.D., an orthopedic surgeon, consultatively examined Ramos on April 22, 2003

and reviewed records of her work-related injuries on January 10, 2000 and September 25, 2002.  R.

323-26.  Ramos reported that 90% of her problem is back pain and 10% is in the left leg.  R. 324.

Ramos reports her pain as being 8-9 out of 10.  *Id*.  She had been off work since November 21, 2002

per Dr. Jose Richards.  *Id*.  She was attending training as a medical secretary.  *Id*.  Dr. Zak observed

that Ramos was able to ambulate normally without an assistive device and she was able to stand easily

from a seated position.  R. 325.  Her neurological exam was entirely normal.  *Id*.  Dr. Zak reviewed

the MRI scans from May 2000 and December 2002 and diagnosed chronic low back pain, chronic

sprain/strain, and degenerative disk disease (DDD) at L4-5 and LS-Sl with disk bulging.  *Id*.  Dr. Zak

determined that Ramos had reached maximum medical improvement and no further physical therapy

or surgery was recommended.  R. 325-26.  He agreed with the 6% impairment rating.  R. 326.  Dr. Zak

opined that Ramos should not return to work as a nursing assistant due to risk for further injury.  *Id*.

He recommended light work with no lifting over 15-20 pounds, infrequent bending at the waist, no

prolonged walking or standing, and the ability to change positions every 30 minutes when seated or

standing for prolonged periods. *Id*. He also recommended a functional capacity evaluation and continued pain management with medications. *Id*.

Jose R. Thomas-Richards, D.O., examined Ramos on April 24, 2003, and noted her medical history and occupational history. R. 327-32. Dr. Thomas-Richards noted that Ramos was 63 inches tall, weighed 125 pounds, and her blood pressure was 118/72. R. 330. His diagnoses were chronic, recurrent, musculoligamentous strain of the lumbosacral spine; moderate spinal stenosis at L3-4 and L4-5 due to disk bulging with bony hypertrophy; and chronic mechanical low back pain syndrome. R. 331. Dr. Thomas-Richards opined that Ramos could sit for 6-7 hours, stand for 3-4 hours, and walk for 3-4 hours in an 8-hour day. *Id*. She did not require an assistive device for ambulation. *Id*. She could sit or stand for 10-15 minutes at a time before changing positions. R. 332. She could walk 5 minutes before stopping to rest. *Id*. There were no restrictions in her ability to use her hands, arms, and shoulders to perform fine manipulation or dexterity, work above shoulder level, push, or pull. *Id*. She could lift and carry 10-15 pounds continuously, 20-30 pounds frequently, and 45 pounds maximum occasionally. *Id*. She should minimize activities requiring repetitive foot movements, such as operating foot controls, and she should not work at elevated heights or climb unprotected heights. *Id*. There were no findings suggestive of mental or emotional instability. *Id*. Dr. Thomas-Richards noted that Ramos was enrolled in classes at that time to be a medical secretary, and he felt that was an ideal vocation, as it would allow her a sit/stand option. *Id*. Dr. Thomas-Richards further opined that Ramos could work with minimal supervision. *Id*.

On April 30, 2003, Ramos's physical therapist stated that Ramos had not been seen in therapy since February 3, 2003. R. 333. She determined that Ramos had reached a plateau in therapy and

no further significant objective progress was expected. *Id*. She also noted that Ramos's pain complaints were inconsistent. *Id*.

Jorge F. Gonzalez, M.D., an internal medicine specialist, initially examined Ramos on June 14, 2004, and found she weighed 1 15 pounds and her blood pressure was 152/90. R. 384-86. Her gait was normal. R. 385. Her mental and emotional functioning was normal. *Id*. Her sensory, motor, and reflex exams were normal. *Id*. Dr. Gonzalez' diagnoses were hypertension, low back pain, spinal stenosis, and prolonged depressive reaction. R. 385-86. Diovan for hypertension was added to her Darvocet, Celebrex, Wellbutrin, Neurontin, and Remeron. R. 386.

Dr. Gonzalez saw Ramos again on July 12, 2004, when her blood pressure with Diovan was improved to 128/78. R. 383. Dr. Gonzalez noted Ramos was stable and doing well. *Id*. He did not change her medications. *Id*.

When Dr. Gonzalez saw Ramos on November 24, 2004, Ramos complained of fluctuating blood pressure and dizziness for weeks. R. 379-80. She had been smoking cigarettes for one month and smoked a pack a day. R. 379. With shoes and fully clothed, Ramos weighed 110 pounds and her blood pressure was l42/80. *Id*. She stated she continued taking Diovan. *Id*. Diagnoses without testing were dizziness, mitral aortic valve insufficiency, hypertension, low back pain, spinal stenosis, and prolonged depressive reaction. *Id*. She had stopped taking Darvocet, Celebrex, Wellbutrin, Neurontin, and Remeron, and no medications were added. *Id*.

Lab tests showed Ramos's sedimentation rate on November 26, 2004, was normal. R. 395. Her bone density test on December 10, 2004 revealed moderate bone loss of the hip, but normal bone mass of the spine. R. 387.

On December 28, 2004, Ramos followed up with Dr. Gonzalez.  R. 381.  She had no new medical complaints.  *Id.*  She was taking only Diovan and Estratest.  *Id.*  She weighed 113 pounds and her blood pressure was 124/74.  *Id.*  No changes were made in her medications.  *Id.*  Ramos did not return to Dr. Gonzalez until June 24, 2005, when she complained only of some white spots on her legs.  R. 382.  She weighed 113 pounds and her blood pressure was 150/80, although she reportedly was still taking Diovan.  *Id.*  Her exam was normal except dermatophytosis of the body was diagnosed and Elocon was prescribed.  *Id.*

## VI.    THE ANALYSIS

### A.    The Commissioner's Decision Must Be Reversed Due to Failure to Weigh All of the Medical Opinions

Relying heavily on the opinions of Dr. Rubio and Dr. Warren, Ramos argues that she meets Listing 12.04 regarding affective disorders.   Buried in Ramos's argument, however, Ramos acknowledges that the ALJ has failed to weigh all of the medical opinions, and this is reversible error. Docket 13 at 5.  The Commissioner fails to address the impact of the ALJ's failure to weigh all of the opinions.

Absent the existence of "good cause" to the contrary, the ALJ must give substantial weight to the opinion, diagnosis and medical evidence of a treating physician.  *See MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986); *Lewis v. Callahan*, 125 F.3d 1436, 1439 - 1441 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991);  *Sabo v. Comm'r of Social Security*,  955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d).  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical

and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.  20 C.F.R. § 404.1527(d)(2).

The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  *See Edwards*, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).  Similarly, the ALJ may reject any medical opinion if the evidence supports a contrary finding.  *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1986).  Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also, Schnor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).

When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the 1.) length of the treatment relationship and the frequency of examination; 2.) the nature and extent of the treatment relationship; 3.) the medical evidence supporting the opinion; 4.) consistency with the record a whole; 5.) specialization in the medical issues at issue; 6.) other factors which tend to support or contradict the opinion.  20 C.F.R. § 404.1527(d).  However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  *See Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir.1984); *see also,* 20 C.F.R. § 404.1527(d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  20

C.F.R. § 404.1527(e).  The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because those ultimate determinations are for the Commissioner. 20 C.F.R. § 404.1527(e).

The ALJ must, however, state with particularity the weight given different medical opinions and the reasons therefor, and the failure to do so is reversible error.  *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir.1986).  Without the ALJ making the necessary findings, it is impossible for a reviewing court to determine whether the ultimate decision is supported by substantial evidence.  *Hudson v. Heckler*, 755 F.2d 781, 786 (11th Cir. 1985).

In this case, the ALJ gave "great weight" to the assessments of Dr. Inga, Dr. Zak, and Dr. Thomas-Richards.  R. 28.  Each of these three doctors were consulting physicians.  The ALJ did not weigh the opinions of other consulting physicians, including the opinions of Dr. Warren and Dr. Rubio.  Because the ALJ failed to assess the weight to be given to other medical opinions, the Court is unable to perform its review.

The Commissioner's decision, therefore, must be reversed and remanded so that the ALJ can make the required findings.

**B.       Determination of the Ramos's Ability to Perform Substantial Gainful Activity**

Ramos argues that the ALJ erred in determining her RFC because he applied the wrong standard at Step 5 of the analysis.  Specifically, Ramos argues that the ability to perform substantial gainful activity means that the individual can work on a sustained basis for eight hours a day.  Ramos

argues that it was inconsistent for the ALJ to find at Step 1 that Ramos was not performing substantial gainful activity, but finding that she could perform substantial gainful activity at Step 5.

The Court concludes that these findings are not necessarily inconsistent.  The ALJ could find that Ramos is capable of working more than she has in the past.  Such findings could be supported by the medical opinions.  As the ALJ has not weighed all of the medical opinions, however, the Court cannot conclude at this time that the decision was supported by substantial evidence.

### C.    Existence of Work in Significant Numbers

Ramos also argues that the ALJ erred in finding that she was not disabled because other work did not exist in significant numbers that accommodates her RFC.  Ramos first argues that the ALJ found that she could have occasional interaction with the public or coworkers (R. 30), and that the VE opined that Ramos could work as a ticket seller.  R. 31.  Ramos contends that "occasional" is defined by the DOT and the regulations as being one-third of an eight-hour day, but that the ALJ in asking his hypothetical question of the VE gave a different definition of occasional.

The Court has reviewed the hypothetical question and the VE's testimony, and finds that the ALJ did not alter the definition of "occasional."  Rather, when the ALJ asked about a limitation of occasional interaction with the public or co-workers, the VE asked the ALJ to explain what he meant by "interaction."  R. 434.  Although the ALJ and VE talked at the same time, making the transcript more difficult to read, the transcript supports the ALJ's finding that Ramos could work as a ticket seller with the limitation of occasional interaction with the public or coworkers.  R. 435.

Ramos next argues that the ALJ's findings regarding the number of available jobs does not support a finding that jobs exist in sufficient numbers in the national economy.  Ramos points out that the VE testified that 300 ticket seller jobs existed locally, and 3,000 existed statewide (R.434), but the

ALJ's decision says that 300 exist in the state economy and 3,000 exist in the national economy.  R. 31.  Ramos argues the Commissioner should be "stuck" with the ALJ's decision, and the decision fails to demonstrate a sufficient number of jobs.

The Commissioner argues that the ALJ's error is of a typographical nature, is harmless, and did not effect the ultimate outcome of the decision.  The Court agrees.  The Commissioner also argues that Eleventh Circuit precedent supports the Commissioner's finding that a sufficient number of jobs exist.  In *Allen v. Bowen*, 816 F.2d 600, 602 (11th Cir. 1987), the VE testified as to the existence of 174 locally, 1,600 jobs in the state, and 80,000 jobs in the national economy that the plaintiff could perform.  *Id*.  Focusing solely on the number of jobs locally, the Eleventh Circuit found that the Commissioner had presented substantial evidence to support the Commissioner's decision.  *Id*.  Applying the reasoning of *Allen v. Bowen*, the VE's testimony that 300 ticket seller jobs exist locally provides substantial evidence for the ALJ's finding that jobs exist in sufficient numbers that Ramos can perform.

Ramos also attacks the VE's opinion on the grounds that the ALJ failed to ask a hypothetical question that comprehensively described Ramos's impairments.  Specifically, Ramos argues that the ALJ failed to include her depression and inability to concentrate.  The ALJ found that Ramos's claims of disabling depression was not supported by the medical evidence.  R. 27.  Therefore, the ALJ did not err in failing to include "depression" in the hypothetical.

As to concentration, the ALJ found that "the claimant has moderate or less restriction of activities of daily living, difficulties in maintaining social functioning and difficulties in maintaining concentration, persistence or pace."  R. 25.  Unfortunately, the ALJ's finding on this issue is too imprecise for the Court to determine whether Ramos's limitations in concentration should have been

included in the hypothetical presented to the VE.  *See, e.g., Heppell-Libsansky v. Comm'r of Social Security*, 170 Fed.Appx. 693, 696, 2006 WL 622745 *2 (11th Cir. March 14, 2006) (inclusion of moderate concentration deficit in hypothetical question); *Wind v. Barnhart*, 133 Fed.Appx. 684, 688, 2005 WL 1317040 *3 (11th Cir. June 2, 2005) (inclusion of mild to moderate limitations in concentration in hypothetical question).  Remand under Sentence Four, therefore, is appropriate.  *See, Sayles v. Barnhart*, 2004 WL 3008739 *22 (N.D. Ill., December 27, 2004) (remand required where ALJ failed to incorporate plaintiff's mental impairment related to his moderate difficulties in maintaining concentration, persistence or pace into the hypothetical questions posed to the VE).

### D.    Application of the Eleventh Circuit Pain Standard

Ramos argues that the ALJ failed to properly utilize the Eleventh Circuit pain standard. Congress has determined that a claimant will not be considered disabled unless she furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged.  42 U.S.C. § 423(d)(5)(A).  The ALJ must consider all of a claimant's statements about her symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.  20 C.F.R. § 404.1529.  In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote,* 67 F.3d at 1560, *quoting Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  Pain alone

can be disabling, even when its existence is unsupported by objective evidence, *Marbury v. Sullivan*,

957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself,

conclusive of disability.  42 U.S.C. § 423(d)(5)(A).

The ALJ found that the medical evidence showed that Ramos had underlying medical

conditions, but that it did not support her allegations of limitation of function or pain to the degree that

it would preclude all substantial gainful activity.  R. 26.  The ALJ further found that Ramos's

allegations of pain are inconsistent with her daily activities including owning and operating her own

business, maintaining her own residence, caring for her needs and those of her minor daughter,

maintaining a relationship with a boyfriend, driving, cooking, shopping, performing household chores,

and attending church.  R. 26.  The ALJ properly applied the pain standard.

## VI.    <u>CONCLUSION</u>

For the reasons stated above, the decision of the Commissioner should be reversed and

remanded pursuant to Sentence Four.  The Clerk should enter judgment in favor of Plaintiff and close

the case.

Failure to file written objections to the proposed findings and recommendations in this report

pursuant to 28 U.S.C. § 636 (b)(1) and Local Rule 6.02 within ten (10) days from the date of its filing

shall bar an aggrieved party from attacking the factual findings on appeal.

Recommended in Orlando, Florida on July 6, 2007.

*Donald P. Dietrich*

DONALD P. DIETRICH
UNITED STATES MAGISTRATE JUDGE

-26-

The Court Requests that the Clerk
Mail or Deliver Copies of this Order to
All Counsel of Record and *Pro Se* Litigants,
and to:

The Honorable John Antoon II
United States District Judge

Mary Ann Sloan, Chief Counsel
Dennis R. Williams, Deputy Chief Counsel
Jerome M. Albanese
Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia        30303-8920

The Honorable Robert Burdette
Administrative Law Judge
c/o Social Security Administration
Office of Hearings and Appeals
1000 N. Ashley Dr.
The Times Bldg. #200
Tampa, FL                33602